Eric R. Henkel
CHRISTIAN, SAMSON & BASKETT, PLLC
310 W. Spruce Street
Missoula, Montana 59802
Tel:   (406) 721-7772
Email: eric@csjlaw.com

Robert Terrazas
Dana A. Henkel
TERRAZAS HENKEL, P.C.
P.O. Box 9077
Missoula, MT 59807
Email: attorneys@terrazaslaw.com
        *Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION**

| | |
|---|---|
| SHANDA SARCHETTE, an individual; and MARCIE CALDWELL, an individual, | Cause No. CV 19-124-M-DWM |
| Plaintiffs, | |
| vs. | **FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |
| ALEX M. AZAR II, Secretary of the United States Department of Health and Human Services; PAUL CARLSON, an individual; DEBORAH WILSON, an individual; and JOHN DOES 1-9, | |
| Defendants. | |

COME NOW, Plaintiffs Shanda Sarchette and Marcie Caldwell (collectively "Plaintiffs"), and for their First Amended Complaint ("Complaint") and Demand for Jury Trial against the above-named Defendants, allege and state as follows:

## PARTIES

1.      Plaintiff Shanda Sarchette ("Ms. Sarchette") is an individual and a female.  Ms. Sarchette is, and at all times relevant to this Complaint was, a resident of Ravalli County, Montana.

2.      Plaintiff Marcie Caldwell ("Ms. Caldwell") is an individual and a female. Ms. Caldwell is, and at all times relevant to this Complaint was, a resident of Ravalli County, Montana.

3.      Defendant Alex M. Azar II ("Azar") is the Secretary of the United States Department of Health and Human Services (the "Department").  Azar is named as the Defendant in this action in his capacity as the Secretary of the Department.  The Department is an executive department of the federal government of the United States of America.

4.      Defendant Paul Carlson ("Carlson") is an individual.  Upon information and belief, Carlson is a resident of Cascade County Montana, and at all times relevant to this Complaint was a resident of Ravalli County, Montana.

5.      Defendant Deborah Wilson ("Wilson") is an individual. Upon information and belief, Wilson is, and at all times relevant to this Complaint was a resident of Montgomery County, Maryland.

6.      Defendants John Does 1 through 9 are individuals or entities believed to be responsible in some manner for the occurrences and injuries herein alleged.

The claims against John Does 1 through 9 are not yet ripe and/or Plaintiffs are ignorant of the true names, capacities and identities of John Does 1 through 9. Plaintiffs will amend this Complaint to allege the true names, capacities and identities of John Does 1 through 9 once their true names, capacities and identities are ascertained and/or once the claims against those defendants are ripe.

## JURISDICTION AND VENUE

7.      Plaintiffs reallege and incorporate each of the other allegations of this Complaint as if fully set forth herein.

8.      This is an action for employment discrimination and harassment based on sex under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII") and any and all other applicable laws.  This Court has original jurisdiction of this action under 28 U.S.C. § 1331 because this action arises under the laws of the United States.

9.      This is also an action for claims arising under state law.  Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over all state law claims because said claims are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

10. At all times relevant to this Complaint, the Department was Plaintiffs' "employer" or "joint employer" within the meaning of Title VII and within the meaning of any and all other applicable laws.

11. At all times relevant to this Complaint, Plaintiffs were "employees" of the Department within the meaning of Title VII and within the meaning of any and all other applicable laws.

12. Some or all of the unlawful conduct and employment practices alleged herein took place or occurred at the Department's premises located in Ravalli County, Montana.

13. Jurisdiction is proper in this Court.

14. Venue is proper in this Court.

## ADMINISTRATIVE PROCEDURES

15. Plaintiffs reallege and incorporate each of the other allegations of this Complaint as if fully set forth herein.

16. Plaintiffs complied with and exhausted, and/or have been excused from complying with, all pre-filing requirements before bringing this action.

17. In accordance with 29 C.F.R. § 1614.105 and other applicable law, within 45 days of the date of the matter alleged to be discriminatory, Plaintiffs initiated contact with an official logically connected with the Equal Employment Opportunity ("EEO") process and exhibited an intent to file an EEO complaint and

begin the EEO process.

18.     The Department failed to notify Plaintiffs of the pre-complaint

processing requirements and procedures set forth in 29 C.F.R. § 1614.105.

Instead, the Department made representations and/or engaged in conduct which led

Plaintiffs to reasonably believe they had satisfied the requirements of 29 C.F.R. §

1614.105 or were excused from satisfying the requirements of 29 C.F.R. §

1614.105.  Under the circumstances, based on the Department's representations,

acts, and omissions, it was reasonable for Plaintiffs to believe that they had

satisfied the requirements of 29 C.F.R. § 1614.105 or were excused from satisfying

the requirements of 29 C.F.R. § 1614.105.

19.     In accordance with 29 C.F.R. § 1614.105(d) and 29 C.F.R. §

1614.106, Plaintiffs filed a formal administrative complaint within 15 days of

receipt of the notice required by 29 C.F.R. § 1614.105(d), (e) or (f).

20.     On or around May 8, 2019, Ms. Sarchette received a "Final Agency

Decision" along with a notice indicating that she had the right to file a civil action

in United States District Court within 90 days of her receipt of the "Final Agency

Decision."

21.     Based upon the date of receipt of the "Final Agency Decision," this

Complaint is timely, and Ms. Sarchette has met and exhausted all administrative

prerequisites for the filing of this civil action.

22.     Likewise, Ms. Caldwell has met and exhausted all administrative prerequisites for the filing of this civil action.  On or around October 17, 2019, the Department's Office of Equity, Diversion, and Inclusion ("EDI") provided Ms. Caldwell with its Report of Investigation ("ROI") advising she had thirty (30) calendar days from her receipt of the ROI to request either a Final Agency Decision from the Department of Health and Human Services (the "Department"), or a hearing in front of the Equal Employment Opportunity Commission ("EEOC").

23.     The ROI consists of approximately 770 pages and is rife with facts demonstrating Defendants' egregious misconduct.  The ROI overwhelmingly reveals that Defendants negligently, recklessly and intentionally engaged in a pattern of misconduct over a period of years to the extreme detriment of Plaintiffs and other female employees of the Department.  Specifically, the ROI reveals repeated instances of Carlson's sexually harassing and perverted misconduct toward female employees along with Wilson's and the Department's ratification of, and/or participation in, Carlson's misconduct.  Ultimately, the ROI indisputably demonstrates that Plaintiffs suffered severe harm as a consequence of Defendants' egregious disregard of their legal duties and obligations.

24.     On or around November 14, 2019, within 30 calendar days of the Department's October 17, 2019 correspondence, Ms. Caldwell requested a Final

Agency Decision from the Department.  As a result, the Department had sixty (60) days to issue its final agency decision.  The Department did not meet its 60-day deadline.

25.     On or around January 29, 2020, well after sixty (60) days passed, Ms. Caldwell inquired as to the status of her claim. EDI did not provide a status, but rather requested that its "processing unit" provide an update.

26.     On or around January 31, 2020, Ms. Caldwell again contacted EDI this time requesting confirmation that she has the right to sue and bring a civil action. Ms. Caldwell pointed out that the Department had sixty (60) days to issue a final agency decision under 29 CFR § 1614.110(b) and that seventy-nine (79) days had passed.

27.     On or around February 4, 2020, EDI responded that the Department had not yet issued a final agency decision.  It did not provide Ms. Caldwell with any affirmative response as to whether she had the right to sue or not, ignoring the question and claiming, Ms. Caldwell, "certainly ha[s] the right to take steps to address the failure on the part of the Agency to timely issue the decision. As it relates to which course of action you should take, we cannot advise you in that regard, but you certainly have options available to you."

28.     As of the date of this filing, the Department has yet to comply with its

mandatory obligation to issue a final agency decision. Nor has it provided Ms. Caldwell with any confirmation of her right to sue. The Department's disregard of its obligation to issue a final agency decision, and its refusal to respond to Ms. Caldwell's request regarding her right to sue, is inexplicable and unfairly prejudicial to Ms. Caldwell.  The Department's refusal to issue a final agency decision is especially troubling in light of the fact that the ROI indisputably substantiates Ms. Caldwell's claims with overwhelming facts demonstrating that Defendants negligently, recklessly and intentionally engaged in a pattern of misconduct over a period of years to the extreme detriment of Plaintiffs and other female employees of the Department.

29.     Ms. Caldwell has met and exhausted all administrative prerequisites for the filing of this civil action, or, under the circumstances, she should be deemed to have met and exhausted all administrative prerequisites.  This is especially so considering the substantial time and resources Ms. Caldwell has spent (1) complying with all requirements of the various administrative processes and (2) waiting for a final agency decision on matters of grave import to her.

30.     Ms. Caldwell's Complaint is timely.

## FACTS COMMON TO ALL COUNTS

31.     Plaintiffs reallege and incorporate each of the other allegations of this Complaint as if fully set forth herein.

**A. The Department Acted as Plaintiffs' Joint Employer**

32.     In or around November 2008, Ms. Sarchette began working as a safety specialist at Rocky Mountain Laboratories ("RML") in Ravalli County, Montana. RML is a biomedical research facility owned, operated and controlled by the Department.

33.     Beginning in or around November 2008 and continuing through the present, Ms. Sarchette worked as a safety specialist within the Department's Technical Assistance Branch, Division of Occupational Health and Safety, National Institute of Allergy and Infectious Diseases, National Institutes of Health.

34.     Beginning in or around December 2012 and continuing through the present, Ms. Caldwell worked as a Registered Nurse IV at RML within the Division of Occupational Health and Safety, Occupational Medical Service, National Institute of Health.

35.     At all times relevant to this Complaint, Plaintiffs were full-time employees of the Department at the RML facility.

36.     At all times relevant to this Complaint, the Department was Plaintiffs' employer or joint employer.

37.     At all times relevant to this Complaint, Plaintiffs reported to, and were supervised and monitored by, representatives of the Department. Carlson, who was an employee and representative of the Department, affirmatively represented

to Plaintiffs that he was their supervisor and boss and that he had the authority to terminate their employment.

38.     At all times relevant to this Complaint, Plaintiffs' job duties and performance were always subject to the supervision and oversight of one or more representatives of the Department, including but not limited to, Carlson.

39.     At all times relevant to this Complaint, the Department had the power, either indirectly or directly, to discipline Plaintiffs and to terminate their employment.

40.     At all times relevant to this Complaint, the Department furnished Plaintiffs with a place to work, and with the instrumentalities, equipment, resources and training needed to execute and perform their job duties. Plaintiffs were required to submit requests to Carlson if they needed equipment or supplies.

41.     At all times relevant to this Complaint, Plaintiffs' job duties and work performance were an integral part of the business of the Department.

42.     At all times relevant to this Complaint, the Department had the right and/or power to assign additional projects and/or work to Plaintiffs.

43.     At all times relevant to this Complaint, the Department had primary and/or significant discretion over when and how long Plaintiffs would work.

44.     At all times relevant to this Complaint, the Department exercised primary and/or significant control over the terms and conditions of Plaintiffs'

employment and over the means and manner of their work performance. The Department controlled and directed the work of Plaintiffs, not only as to the results achieved, but also as to the details by which those results were achieved.

45.     In approximately 2015, the Department awarded Ms. Caldwell with a Recognition of Excellence for her "critical contribution to […] the NIH workforce."

46.     At all times relevant to this Complaint, representatives of the Department, including but not limited to Carlson, intended to, and did, exercise primary and/or significant control over the terms and conditions of Plaintiffs' employment and over the means and manner of Plaintiffs' work performance.

47.     At all times relevant to this Complaint, Plaintiffs reasonably believed that representatives of the Department, including Carlson, had primary and/or significant control over the terms and conditions of their employment and over the means and manner of their work performance

**B. Factual Allegations Related to Carlson**

48.     Beginning in or around 2009 and continuing through the end of approximately 2018, Carlson continuously and repeatedly subjected Ms. Sarchette to discriminatory, harassing, threatening, invasive, and outrageous conduct based upon her sex.

49.     Similarly, beginning in or around 2013 and continuing through the end of approximately 2018, Carlson continuously and repeatedly subjected Ms. Caldwell to discriminatory, harassing, threatening, invasive, and outrageous conduct based upon her sex.

50.     Specifically, Carlson continuously and repeatedly made sexually inappropriate, lewd and threatening comments to Plaintiffs and other female employees of the Department.  Carlson's sexually inappropriate, lewd and threatening comments included, without limitation, the following:

> (a)     Carlson would rate the physical appearance of female employees, including Plaintiffs, on a scale of 1-10;
>
> (b)     Carlson made comments about the size and appearance of Plaintiffs' breasts;
>
> (c)     Carlson commented to female employees, including Ms. Sarchette, how if he were in her position, he would use his body and looks to "get laid";
>
> (d)     Carlson told Plaintiffs that if he had known they were into older guys, he would have stopped at nothing to attempt to date them;
>
> (e)     Carlson made sexually inappropriate and lewd comments about the physical appearance of his own teenage daughter and Ms. Caldwell's minor daughter;

(f)     Carlson asked female employees, including Plaintiffs, if they knew what the age of consent was in Montana for statutory rape;

(g)     Carlson made comments to Ms. Sarchette and her mother about wanting to have a sexual 3-way relationship with them;

(h)     Carlson told Ms. Caldwell she was lucky the two had not met in high school because if they had, Ms. Caldwell would have been in "trouble," implying he would have forced himself upon her sexually;

(i)     On one occasion, Carlson told Ms. Sarchette that when she first started her employment, she was "completely hot" but now she was "chubby" and thus unattractive. Afterwards, Carlson continued expressing his attraction to Ms. Sarchette and expressed a desire to "run away" with her;

(j)     Carlson told Ms. Sarchette that because he was a federal employee, he would have to "murder or rape someone" before he would be fired;

(k)     Carlson told Plaintiffs that he wanted to have a sexual affair with another employee of the Department who had just as much to lose as he did;

(l)     Carlson implied he could have Ms. Sarchette terminated if she ever reported his sexually inappropriate and lewd behavior to anyone within the Department;

(m)     Carlson asked Plaintiffs, "What's worse? A thousand cocks or the same cock a thousand times?";

(n)     Carlson discussed the size of his penis with Ms. Caldwell, telling her "he knew what to do with it";

(o)     Carlson told Ms. Caldwell during a training exercise that he wished he would have been able to watch her change her clothes;

(p)     Carlson became sexually aroused and exhibited an erect penis when harassing Ms. Caldwell or when Ms. Caldwell vocalized her resistance to his outrageous behavior and comments.

(q)     When Ms. Sarchette vocalized her resistance to Carlson, he told her she was "sexy" when she was mad and wanted to see it more often.

51.     Some or all of Carlson's wrongful conduct alleged herein, including, but not limited to, his sexually inappropriate, lewd and threatening comments, occurred during the course and scope of Carlson's and Plaintiffs' employment with the Department.

52.     Alternatively, some or all of Carlson's wrongful conduct alleged herein, including, but not limited to, his sexually inappropriate, lewd and threatening comments, occurred outside the course and scope of Carlson's and Plaintiff's employment with the Department.

53.     In fact, in some instances, Carlson's wrongful acts were manifestly beyond the scope of his official duties and were designed to, and did, interfere with Plaintiffs' personal affairs.  For example, Carlson would often drive by Ms. Sarchette's personal residence and then subsequently make threatening statements to her about how he knew when she was home alone and knew who visited.

54.     Furthermore, Carlson frequently discussed personal details about Ms. Sarchette's daily life that he would only know if he was inappropriately monitoring her personal residence.  For example, Carlson described knowing that Ms. Sarchette did not have curtains or blinds on certain windows in her home.  He gave descriptive accounts of Ms. Sarchette's conduct within her home, sometimes even describing how Ms. Sarchette was dressed.

55.     Carlson's invasion into Plaintiffs' personal affairs was beyond all bounds of reason.

56.     Additionally, Carlson routinely made threatening statements to Plaintiffs about how he would seek revenge against people who he had personal

issues with and did not like. Carlson made clear to Plaintiffs that he would seek and obtain revenge no matter how long it took, even if it took years.

57.     Plaintiffs knew Carlson was serious about his vengeful nature because they had both personally witnessed him seek revenge on other employees at the Department and had experienced his vindictiveness first-hand during their employment at the Department.

58.     In fact, in at least one instance, Carlson retaliated against Ms. Caldwell by falsely and maliciously attacking her work performance and attendance in an effort to have her terminated merely because Ms. Caldwell asked to change offices.

59.     Carlson's highly inappropriate and malicious behavior was well known to various supervisors within the Department but was left unchecked. Instead, Carlson claimed the Department promoted him and bragged that he was untouchable. Within weeks Ms. Caldwell and her female co-worker were no longer allowed to participate in the weekly division meeting they had regularly attended in the past.

60.     Carlson routinely bragged to Plaintiffs that he was untouchable and had influence over whether the Department hired or fired employees.

61.     Carlson made a point to intimidate Plaintiffs and instill fear by telling them he enjoyed bow hunting because he enjoyed watching the life slowly drain

out of the animals. Carlson often correlated assaulting women with hunting in the woods.

62.     In addition to his highly inappropriate and threatening statements to Plaintiffs, Carlson also made inappropriate physical contact with Ms. Sarchette by placing his hands on her when the opportunity arose in social settings.

63.     As a result of Carlson's outrageous and threatening behaviors, Plaintiffs began living in a constant state of fear.  Plaintiffs were terrified of encountering Carlson, both at work and in public, and began acting in ways to avoid him.

64.     Ms. Caldwell was so fearful for her personal safety she installed security cameras at her personal residence, fearing Carlson would show up at her home unannounced and harm her.

65.     Plaintiffs reasonably feared for their physical safety especially after Ms. Sarchette attended a social outing with co-workers where rumors circulated that Carlson sexually assaulted a female Department employee. The morning after the alleged sexual assault, Ms. Sarchette noticed scratches on the left side of Carlson's neck.  Carlson threatened her not to say anything to anyone.

66.     In late 2018, several Department employees confirmed Plaintiffs reports about Carlson's retaliatory nature and expressed concerns about Plaintiffs' safety.

67.     Some or all of Carlson's wrongful conduct resulted in highly personal violations to Plaintiffs beyond the meaning of "discrimination." Carlson's highly inappropriate monitoring of Plaintiffs' personal residence, threatening statements to Plaintiffs, outrageous sexual propositions to Plaintiffs, and physical contact with Plaintiffs were manifestly beyond the scope of his authority and official duties.

68.     Some or all of Carlson's wrongful conduct negatively affected and/or interfered with Plaintiffs' personal life, causing them harm and severe emotional distress, including, but not limited to, personal fear, shame, humiliation, and intimidation.

69.     Carlson's outrageous and wrongful conduct caused Plaintiffs to seek counseling to cope with personal fear, shame, humiliation, and intimidation.

70.     Plaintiffs were not the only female employees of the Department who experienced and were subjected to Carlson's sexually inappropriate, lewd and threatening behavior. Plaintiffs witnessed, or were informed of, numerous other instances where Carlson engaged in sexually inappropriate, lewd and/or threatening behavior toward female employees of the Department.

71.     As a consequence of Carlson's discriminatory and harassing conduct Plaintiffs experienced and suffered severe emotional distress, including, but not limited to, shame, humiliation, intimidation, and fear.

72. As a consequence of Carlson's conduct, Plaintiffs suffered damages, both general and special, in an amount to be proven at the time of trial.

## C. The Department's Unlawful Conduct

73. Beginning in or around 2009 and continuing through the end of approximately 2018, the Department knew or should have known of Carlson's discriminatory and harassing conduct toward Plaintiffs and other female employees of the Department.

74. Specifically, Wilson, who was in a position of authority within the Department, was made aware, and knew, of Carlson's discriminatory and harassing conduct toward Plaintiffs and other female employees of the Department. Wilson purposefully engaged in a series of actions designed to protect Carlson, thereby acquiescing in his wrongful conduct.

75. Other individuals in positions of authority within the Department, including, but not limited to, John Barr ("Barr"), were also made aware, and knew, of Carlson's discriminatory and harassing conduct toward Plaintiffs and other female employees of the Department. Like Wilson, these other individuals, including Barr, engaged in a series of actions designed to protect Carlson, thereby acquiescing in his wrongful conduct.

76. Some or all of Carlson's, Wilson's, Barr's and other Department representatives' actions occurred while they were acting in their capacity as

representatives of the Department. At all times relevant to this Complaint, the Department had control over Plaintiffs' work environment and place of work.

77. At all times relevant to this Complaint, the Department failed to take prompt measures within its control to eliminate, correct, and/or remedy Carlson's discriminatory and harassing conduct.

78. At all times relevant to this Complaint, Plaintiffs were subjected to the unlawful discriminatory and harassing conduct described herein because they are female.

79. The Department knew or should have known about Carlson's sexually harassing and discriminatory conduct and failed to correct it, allowing it to continue for years.

80. When Plaintiffs and other employees complained to the Department about Carlson's discriminatory and harassing conduct to persons in positions of authority within the Department, the Department did nothing to eliminate, correct, and/or remedy Carlson's discriminatory and harassing conduct.

81. Indeed, the Department intentionally disregarded numerous reports from employees about Carlson's harassing and discriminatory conduct toward Plaintiffs.

82. Upon information and belief, the only formal response the Department ever made to these reports was to have Barr circulate an email to its employees

with a copy of the Department's sexual harassment policy. The Department knew Carlson did not intend to comply with the policy because in at least one instance Carlson responded to Barr: "What if I am not getting harassed enough. Who can I speak with?????"

83.     Despite knowing of the discriminatory and harassing conduct and of Carlson's intent to continue engaging in such conduct, the Department allowed Carlson to continue having access to female employees, including Plaintiffs.

84.     Indeed, in many instances, the Department acquiesced and participated in Carlson's unlawful conduct by threatening Plaintiffs with discipline if they did not stop complaining about Carlson.

85.     Eventually, in or around November 2018, the Department placed Carlson on administrative leave and initiated an investigation into his conduct.

86.      In or around late 2018, the Department reported to Plaintiffs that Carlson's employment with the Department came to an end as a direct result of written complaints that Plaintiffs and other female employees made about Carlson's discriminatory and harassing conduct.

87.     In June 2019, the Department advised during an investigation that Carlson was still employed.

88.     As a consequence of Carlson's discriminatory and harassing conduct and as a consequence of the Department's failure to eliminate, correct, and/or

remedy Carlson's discriminatory and harassing conduct, Plaintiffs were subjected to an extremely hostile work environment for years.

89.     As a consequence of Carlson's discriminatory and harassing conduct and as a consequence of the Department's failure to eliminate, correct, and/or remedy Carlson's discriminatory and harassing conduct, Plaintiffs experienced and suffered severe emotional distress, including, but not limited to, shame, humiliation, intimidation, and fear.

90.     As a consequence of Carlson's and the Department's conduct, Plaintiffs suffered damages, both general and special, in an amount to be proven at the time of trial.

**D. Allegations Related to Deborah Wilson**

91.     Upon information and belief, and all times pertinent hereto, Wilson was employed by the Department as the Director of the Department of Health and Safety, Office of Research Services, NIH.

92.     Beginning at the outset of Ms. Sarchette's employment, and even before Ms. Sarchette's first day of employment, and continuing until Carlson's removal in or around late 2018, Wilson and other Department representatives engaged in a continuous chain of tortious activity designed to acquiesce, participate in, and/or promote Carlson's extreme and outrageous conduct toward women, including Plaintiffs.

93.     Wilson's and the Department's wrongful conduct was of such a continuous and egregious manner that no single incident can fairly or realistically be identified as the isolated cause of harm to Plaintiffs.  Instead, Wilson and the Department ratified Carlson's behavior, allying with Carlson in his systematic pattern of harassing, intimidating, and threatening Plaintiffs.

94.     For instance, the first time Ms. Sarchette reported Carlson's sexually harassing conduct, Wilson threatened to terminate her if she continued reporting or complaining. Wilson's threat was just one instance in a long series of continuing and repetitive discriminatory activity continuing through late 2018.

95.     Wilson made it clear on numerous occasions she intended to protect Carlson at all cost even when his misconduct was verified by numerous witnesses and reporters.

96.     Wilson engaged in a repeated and continuous chain of conduct empowering Carlson to mistreat Plaintiffs in any manner he chose, even when Carlson was proven to lack candor.  Indeed, on one occasion, Wilson ostensibly promoted Carlson while sexually discriminating against Caldwell and retaliated against Ms. Caldwell by prohibiting her from attending weekly Department meetings even in the face of Carlson's verified lies and misrepresentations.

97.     Carlson routinely bragged about Wilson's desire to protect him, admitting Wilson suggested he obtain a personal insurance policy to cover any liability stemming from his wrongful and outrageous conduct.

98.     Ms. Caldwell reported Carlson's sexual harassing conduct to Barr, who was employed by the Department as a Human Resources Specialist.  Barr's response was to imply there was nothing he could do to stop the unlawful conduct and advised Ms. Caldwell that Carlson was protected by his federal employment status.

99.     Barr acknowledged Carlson routinely made inappropriate and lewd comments about female employees in his presence.

100.    Furthermore, during the 2018 investigation, several Department employees confirmed Wilson's and Barr's desire to protect Carlson and his unlawful conduct.  These employees explained that they would report Carlson's unlawful behavior to Wilson and Barr, but no action was taken, but rather Wilson and Barr protected Carlson.  Most employees who were interviewed described a lack of trust for Wilson and Barr due to their personal relationships with Carlson.

101.    Wilson's unlawful acquiescence, participation, and promotion of Carlson's sexually inappropriate, lewd and threatening comments, emboldened Carlson's wrongful and outrageous conduct.

102.   Some or all of Wilson's and other Department representatives' wrongful conduct alleged herein, including, but not limited to, their acquiescence, participation, and promotion of Carlson's sexually inappropriate, lewd and threatening comments, occurred during the course and scope of their employment with the Department.

103.   Alternatively, some or all of Wilson's and other Department representatives' wrongful conduct alleged herein, including, but not limited to, their acquiescence, participation, and promotion of Carlson's sexually inappropriate, lewd and threatening comments, occurred outside the course and scope of their employment with the Department.

104.   In fact, Wilson's and other Department representatives' wrongful acts were manifestly beyond the scope of their official duties and were designed to, and did, interfere with Plaintiffs' personal affairs.  For example, Wilson knew Carlson's conduct was extreme, outrageous and transcended the workplace. Nevertheless, Wilson continued to protect and insulate him from any discipline or corrective action related to his sexually inappropriate, lewd, and threatening comments and behavior.

105.   As a result of Wilson's and other Department representatives' participation and acquiescence, Carlson's wrongful and outrageous conduct escalated to the point that he engaged in highly inappropriate monitoring of Ms.

Sarchette's personal residences, made threatening statements to Plaintiffs, made outrageous sexual propositions to Plaintiffs, and had physical contact with Ms. Sarchette.

106.   Wilson's and other Department representatives' participation and acquiescence in Carlson's wrongful conduct negatively affected and/or interfered with Plaintiffs' personal life, causing them harm and severe emotional distress, including, but not limited to, personal fear, shame, humiliation, and intimidation.

107.   As a result of Wilson's and other Department representatives' acquiescence, participation, and promotion of Carlson's sexually inappropriate, lewd and threatening conduct, Plaintiffs experienced and suffered severe emotional distress, including, but not limited to, shame, humiliation, intimidation, and fear.

108.   As a consequence of Wilson's and the Department's conduct, Plaintiffs suffered damages, both general and special, in an amount to be proven at the time of trial.

## COUNT I: DISCRIMINATION
### (against the Department)

109.   Plaintiffs reallege and incorporate each of the other allegations of this Complaint as if fully set forth herein.

110.   The Department engaged in policies and practices which willfully, intentionally, and unlawfully discriminated against Plaintiffs on the basis of their sex.  Those practices and policies included, but were not limited to, allowing Paul

Carlson to work closely with Plaintiffs and other female employees of the Department and failing to warn or protect Plaintiffs from Carlson despite knowing that Carlson was engaging in discriminatory and harassing conduct toward Plaintiffs and other female employees of the Department.

111.   The Department's conduct violates Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and any and all other applicable laws.  Plaintiffs have no plain, adequate, or complete remedy at law to redress the wrongs alleged herein.  Plaintiffs are suffering and will continue to suffer irreparable injury as a result of the acts and omissions of the Department.

112.   As a consequence of the Department's conduct, Plaintiffs suffered and continue to suffer emotional distress.

113.   As a consequence of the Department's conduct, Plaintiffs suffered and continue to suffer damages, both general and special, in an amount to be proven at the time of trial.

## COUNT II: HOSTILE WORK ENVIRONMENT
### (against the Department)

114.   Plaintiffs reallege and incorporate each of the other allegations of this Complaint as if fully set forth herein.

115.   Plaintiffs were subjected to unlawful, inappropriate, lewd, indecent and offensive sexual conduct sufficient to alter the terms, conditions, and privileges of their employment.

116.    The Department's acts and omissions created a hostile work environment.

117.    As a consequence of the Department's conduct, Plaintiffs suffered and continue to suffer emotional distress.

118.    As a consequence of the Department's conduct, Plaintiffs suffered and continue to suffer damages, both general and special, in an amount to be proven at the time of trial.

## COUNT III: NEGLIGENCE
### (against Defendants Carlson and Wilson)

119.    Plaintiffs reallege and incorporate each of the other allegations of this Complaint as if fully set forth herein.

120.    Defendants Carlson and Wilson owed Plaintiffs a duty of reasonable care and a duty to avoid subjecting Plaintiffs to sexually discriminatory and harassing conduct.

121.    Defendants Carlson and Wilson breached their duties to Plaintiffs by, among other things, subjecting them to sexually discriminatory and harassing conduct.

122.    As a consequence of Defendants' conduct, Plaintiffs suffered and continue to suffer emotional distress.

123.    As a consequence of Defendants' conduct, Plaintiffs suffered and continue to suffer damages, both general and special, in an amount to be proven at the time of trial.

## COUNT IV: INTENTIONAL AND/OR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (against Defendants Carlson and Wilson)

124.    Plaintiffs reallege and incorporate each of the other allegations of this Complaint as if fully set forth herein.

125.    Plaintiffs suffered serious and severe emotional distress as a consequence of Defendants Carlson and Wilson's negligent and/or intentional conduct.

126.    Defendants Carlson and Wilson's conduct was outrageous, and the serious and severe emotional distress Plaintiffs suffer is the reasonably foreseeable consequence of Defendants negligent and/or intentional acts or omissions.

127.    As a consequence of Defendants Carlson and Wilson's outrageous conduct, Plaintiffs suffered and continues to suffer serious and severe emotional distress, including, but not limited to, fright, grief, shame, humiliation, embarrassment, anger, and worry.

128.    As a consequence of Defendants Carlson and Wilson's outrageous conduct, Plaintiffs suffered and continue to suffer damages, both general and special, in an amount to be proven at the time of trial.

129.   In addition, Defendants Carlson and Wilson's conduct amounted to "actual malice" as that term is defined under Mont. Code Ann. § 27-1-221(2) in that they (a) deliberately proceeded to act in conscious or intentional disregard of the high probability of injury to Plaintiffs and/or (b) deliberately proceeded to act with indifference to the high probability of injury to Plaintiffs.

130.   As a consequence of Defendants Carlson and Wilson's conduct, Plaintiffs are entitled to an award of punitive damages in accordance with Montana law, including, but not limited to, Mont. Code Ann. §§ 27-1-220 and 27-1-221.

## COUNT V: INVASION OF PRIVACY
### (against Defendants Carlson and Wilson)

131.   Plaintiffs reallege and incorporate each of the other allegations of this Complaint as if fully set forth herein.

132.  Plaintiffs have right of privacy under Montana common law and the Montana Constitution, Article II, Section 10.

133.  Plaintiffs had a reasonable expectation of privacy in their home, in their personal lives, and in their romantic, intimate and/or sexual relationships, among other things.

134.  Defendants Carlson and Wilson intentionally intruded into Plaintiffs' right of privacy including in their homes, personal lives, and romantic, intimate, and/or sexual relationships in such a manner as to outrage and cause mental suffering, shame, and humiliation.

135.   Defendants Carlson and Wilson's conduct intentionally intruded and invaded Plaintiffs' solitude and seclusion in their private affairs and concerns.

136.   As described above, Carlson made unwelcome and outrageous intrusions into the Plaintiffs' homes, by driving by Plaintiffs' homes and/or entering Plaintiffs' property in order to gaze through windows and observe Plaintiffs engaging their private affairs. Carlson then used the details he learned during his unwelcome intrusions to intimidate and humiliate Plaintiffs.

137.   Carlson further made unwelcome intrusions into the Plaintiffs' private affairs by repeatedly making sexual inquiries and sexual propositions to Plaintiffs.

138.   Wilson participated, acquiesced, and promoted Carlson's unlawful conduct by protecting him against any reports or allegations of misconduct and deceit, emboldening Carlson to escalate his unlawful and outrageous conduct to a highly personal level.

139.   Defendants Carlson and Wilson's conduct was wrongful and would be highly offensive to a reasonable person.

140.   As a direct and foreseeable result, Plaintiffs have suffered, and will continue to suffer mental and psychological damages in the form of extreme and enduring worry, humiliation, embarrassment, mental anguish and emotional

distress, all to their damage in amounts within the jurisdictional limits of this Court, to be proved at trial.

141. As described above, Defendants Carlson and Wilson's acted outrageously, maliciously, fraudulently, despicably, and oppressively with the wrongful intention of injuring Plaintiffs from an improper motive amounting to malice in conscious disregard of Plaintiffs' rights. Plaintiffs are entitled to an award of punitive damages in accordance with Montana law, including, but not limited to, Mont. Code Ann. §§ 27-1-220 and 27-1-221.

WHEREFORE, Plaintiffs respectfully prays for the following relief:

1. For judgment against Defendants and in favor of Plaintiffs on all claims alleged in this Complaint;

2. For an award of general and special damages as allowed by law, including, but not limited to, damages for pain and suffering, emotional distress, out-of-pocket expenses, and past and future lost wages and benefits;

3. For an award of punitive damages as allowed by law;

4. For an award of pre- and post-judgment interest as allowed by law;

5. For such injunctive and affirmative relief as will prevent Defendants from engaging in discriminatory and harassing conduct against similarly situated females;

6.      For an award of any and all other appropriate relief necessary to make Plaintiffs whole and compensate them for the civil rights violations and other violations of law described herein;

7.      For an award of costs as allowed by law;

8.      For an award of reasonable attorneys' fees as allowed by law; and

9.      For such other relief as the Court deems just and proper.

DATED this 7th day of April, 2020.

CHRISTIAN, SAMSON & BASKETT, PLLC

By:   /s/ Eric R. Henkel
         Eric R. Henkel
         *Attorney for Plaintiffs*


TERRAZAS HENKEL, P.C.

By:   /s/ Dana A. Henkel
         Dana A. Henkel
         *Attorney for Plaintiffs*

**<u>JURY DEMAND</u>**

COMES NOW, Plaintiffs Shanda Sarchette and Marcie Caldwell, by and through counsel, and hereby demands a jury trial on all issues so triable.

DATED this 7th day of April, 2020.

CHRISTIAN, SAMSON & BASKETT, PLLC

By: _ /s/ Eric R. Henkel_____
      Eric R. Henkel
      *Attorney for Plaintiffs*

TERRAZAS HENKEL, P.C.

By: _ /s/ Dana A. Henkel_____
      Dana A. Henkel
      *Attorney for Plaintiffs*